Filed 5/18/16  P. v. Murillo CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>JOHNNY MURILLO et al.,<br><br>  Defendants and Appellants. | B262271<br><br>(Los Angeles County<br>Super. Ct. No. PA080926) |

APPEAL from judgments of the Superior Court of Los Angeles County, Hilleri G. Merritt and David B. Gelfound, Judges.  Affirmed.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant Johnny Murillo.

Erik Harper, under appointment by the Court of Appeal, for Defendant and Appellant Sylvia Murillo.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant Richard Galindo.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stacy Schwartz and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Johnny Murillo appeals from the judgment entered following his plea of no contest to possession of a controlled substance for sale, following the denial of his suppression motion. (Health & Saf. Code, § 11378; Pen. Code, § 1538.5.) The court sentenced him to 16 months in the county jail. Appellants Sylvia Murillo and Richard Galindo appeal from the judgments entered following their respective pleas of no contest to manufacturing a controlled substance other than phencyclidine, following the denial of their suppression motions. (Health & Saf. Code, § 11379.6, subd. (a); Pen. Code, § 1538.5.) The court suspended imposition of sentence and placed them on probation for 36 months. We affirm.

### FACTUAL and PROCEDURAL SUMMARY

1. *Pertinent Facts as to Appellants Johnny Murillo and Sylvia Murillo.*

    a. *The Search Warrant.*[1]

At 3:00 p.m. on May 28, 2014, a magistrate issued the search warrant at issue in this case. The warrant stated the location to be searched was, inter alia, the single family residence at 17619 Kingsbury in Granada Hills, and vehicles to be searched included a Ford Explorer (hereafter, Explorer) registered to appellant Sylvia Murillo (hereafter, Sylvia). The warrant commanded a search for, inter alia, marijuana and paraphernalia for cultivation of marijuana; "[c]oncentrated cannabis, hashish (aka Butane Honey Oil), [and] all associated chemicals needed to manufacture Butane Honey Oil and all precursor chemicals, including without limitation; butane."

---

[1]    A detailed recitation of the offenses underlying appellants' no contest pleas is unnecessary. It is sufficient to note that on May 28, 2014, police executed a search warrant at the residence at 17619 Kingsbury. All three appellants were inside and manufacturing "hash oil." Police found inside the residence, inter alia, about 437 grams of concentrated cannabis, about 239 grams of cocaine, and numerous manufacturing paraphernalia pertaining to a clandestine laboratory.

2

b. *The Supporting Affidavit.*

The statement of expertise section in the supporting affidavit of Los Angeles Police Detective Tyrone Miles reflects as follows. Miles had been a police officer since 1994. He had received hundreds of hours of training in the subject of dangerous drugs, including training about the manufacture of concentrated cannabis and counter surveillance techniques. He received numerous hours of training in aspects of narcotics investigations from the California Narcotic Officers Association, the California Department of Justice, the Clandestine Laboratory Investigators Association, and the Los Angeles Police Department (LAPD).

Miles previously had worked for the LAPD narcotics division buy team. During that assignment, he had seen over 500 narcotics transactions between users, sellers, and undercover officers, and had interviewed sellers and users of narcotics. Miles was currently assigned to LAPD's "Gang and Narcotics Division, Major Enforcement Section, Clandestine Laboratory Squad." The squad was assigned to the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force. This unit was responsible for investigating illicit manufacturing of dangerous drugs, locating clandestine drug laboratories, and apprehending persons involved. The unit also investigated the sale and possession for sale of dangerous drugs. Miles was also receiving ongoing training from more experienced narcotics detectives with expertise in clandestine laboratories. Miles had authored, and had participated in the execution of, numerous narcotics-related search warrants, and he had testified as a controlled substance expert in municipal, superior, and federal courts.

The narrative section of the affidavit relates the following. About 9:00 a.m. on May 28, 2014, Miles was in the area of Third and Wall in Los Angeles. He was "conducting surveillance of a location that is believed to sell large amounts of the chemical Butane." Butane is a highly flammable chemical used as lighter fluid. Based on Miles's training and experience, he knew large amounts of butane were commonly used in the extraction of tetrahydrocannabinol (THC), the principal psychoactive constituent of marijuana. The butane typically was highly purified and labeled "5X" or

3

"7X." This meant the butane had fewer impurities that could be introduced into finished butane honey oil.

About 10:05 a.m., Miles saw "a male Hispanic leave the business located at 328 E. 3rd Street (JK Imports)." The male was pushing four large boxes. Based on their size, shape, and labeling, Miles knew the boxes were four master cases of highly purified butane. Based on his training and experience in investigating butane honey oil laboratories, Miles knew each master case contained 96 cans, and each can contained 300 milliliters of butane fuel. The Hispanic male placed the four master cases into the rear of the Explorer, then returned to the business.

About 10:10 a.m., a Hispanic female approached, entered the Explorer, and drove away. Miles stated, "We followed the female as she drove to the residence at 17615 [*sic*] Kingsbury Street, Granada Hills. As she drove to that residence, she pulled into a gas station and stopped at a gas pump. She continued looking in her rearview mirror but never exited the vehicle. She then continued driving. She drove slowly down several side streets, making what appeared to be unnecessary directional changes. She also drove down an alley and stopped but did not exit the vehicle."

Miles then stated, "I then observed her drive slowly westbound on Kingsbury and turn into the driveway located at 17617 Kingsbury Street. When I reached the location I observed no one was in the vehicle. [¶] Approximately 50 minutes later, Detective Honore observed the female inside the vehicle. She moved the vehicle to the residence located at 17619 Kingsbury Street. A male Hispanic wearing a great [*sic*] shirt exited the residence, approached the . . . Explorer and took the [four] master cases of butane into the residence. [¶] Based on my training and experience in investigating and processing clandestine Butane Honey Oil manufacturing laboratories, it is my opinion that the residence located at 17619 Kingsbury Street, Granada Hills is currently an active Butane Honey Oil laboratory and this manufacturing process will be found upon service of this search warrant. I formed this opinion based on the . . . counter surveillance driving tactics used by the female Hispanic while en route to the above location, including the numerous side streets she took and the stops she made while looking in the

4

rearview mirror. Also, the fact that she parked the vehicle at a neighboring residence for nearly one hour before moving the vehicle so it could be unloaded is indication that she was attempting to avoid her true destination being discovered. Furthermore, the very large amount of butane we observed go into the residence is indication that the residence is being used for a large scale Butane Honey Oil manufacturing operation. There is no legitimate use for large amounts of butane. A typical lighter holds approximately [15 milliliters] of butane fuel. The total amount of butane observed in this case is [115,200 milliliters]." (This is a total of about 30 gallons.)

    c. *The Suppression Hearing and the Court's Ruling.*

On October 30, 2014, appellant Johnny Murillo (hereafter, Johnny) moved to quash the warrant and suppress evidence. Sylvia joined in the motion. The People filed an opposition. Johnny's argument as presented by his written motion and his oral argument at the January 14, 2015 hearing on the motion alluded to the law prior to *Illinois v. Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527] (*Gates*).[2] Johnny argued there was no probable cause to search in the present case because there was no informant and "source of information," no independent corroboration of criminal conduct, and only the unsubstantiated opinion of Miles.

Without conceding the point, Johnny's counsel indicated he could understand a finding of probable cause if there was "source information specifically about this person or that location, then . . . the, quote, [counter surveillance] driving might be suspicious." However, Johnny's counsel pointed out Miles had no "source information." Johnny's counsel also argued that without evidence of a crime, "the suspicions of the officer, irrespective of any claim of expertise, don't rise to a criminal act." Johnny's counsel further argued that Miles opined, but did not verify, that the boxes contained butane, and

---

[2]    Prior to *Gates*, whether hearsay information provided probable cause to search depended upon a two-prong test focusing on (1) the veracity, and (2) the basis of knowledge, of the hearsay declarant (e.g., an informant), with the veracity prong requiring corroboration where the past reliability of the declarant had not been established. (See *People v. Camarella* (1991) 54 Cal.3d 592, 600 (*Camarella*); *People v. Medina* (1985) 165 Cal.App.3d 11, 17.)

that Miles "says by the look of the box, what's outside the boxes, the markings on the boxes, whatever – it's butane."

Sylvia argued there were insufficient facts supporting Miles's belief she engaged in counter surveillance driving. She argued the lack of specificity as to exact locations and times in Miles's description of her driving demonstrated Miles made up his mind a crime was occurring when the Hispanic male first left JK Imports with the boxes; she asked the court to consider whether, absent the boxes, Sylvia's driving was sufficient to establish probable cause to search.

The court stated, "I can't parse it out that way, because it is a totality. I have to look at the affidavit in its entirety. I can't start parsing things out, because then I'm not making a decision on what was presented." The prosecutor argued Miles's expert opinion about conduct that was otherwise lawful provided probable cause to search.

The court denied the motion to quash, commenting it was struck by Sylvia's driving, "the way in which she drove from point A to point B," which, based on Miles's training and experience, "comport[ed] with [the officer's] estimation of why this butane was sought." The court rejected the argument Miles had to aver he saw boxes labeled "butane." The court also indicated it had read the warrant carefully, additional detail in the warrant might have been helpful but the affidavit was not a "bare bones" affidavit, and the warrant was supported by probable cause to search. The court denied the motions to quash the warrant and suppress evidence.

2. *Procedural History as to Galindo.*

Based on the May 28, 2014 incident (see fn. 1, *ante*), a felony complaint alleged that on or about that date, Galindo manufactured a controlled substance other than phencyclidine, i.e., "honey oil/hash oil," in violation of Health and Safety Code section 11379.6, subdivision (a). On January 14, 2015, Galindo joined in Johnny's motions to quash the warrant and suppress evidence. The court denied the motions.

6

On January 14, 2015, Galindo, represented by counsel, waived his constitutional rights and pled no contest to the charge that on or about May 28, 2014, he manufactured a controlled substance other than phencyclidine. Galindo's counsel joined in the waiver, concurred in the plea, and stipulated to a factual basis. The court found the plea was knowing and intelligent and the court accepted the plea. The court suspended imposition of sentence and placed Galindo on probation for 36 months on the conditions, inter alia, that he serve two days in jail (time served) and perform community labor. The court also imposed various fines and assessments.

## ISSUES (as to Johnny and Sylvia)

Johnny and Sylvia claim the trial court erred by denying their motions to quash the warrant and claim the good faith exception to the exclusionary rule is inapplicable.

## DISCUSSION (as to Johnny and Sylvia)

1. *The Warrant Was Supported by Probable Cause to Search.*

    a. *Applicable Law.*

       (1) *Probable Cause to Search.*

A search warrant must be supported by probable cause. (U.S. Const., 4th Amend.; Pen. Code, § 1525.) "Probable cause to search exists when, based upon the totality of the circumstances described in the affidavit, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' (*Illinois v. Gates* (1983) 462 U.S. 213, 238; [citations.]" (*People v. Farley* (2009) 46 Cal.4th 1053, 1098.) "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Gates*, *supra,* 462 U.S. at p. 238.)

"[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." (*Gates*, *supra*, 462 U.S. at p. 232.) "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By

7

hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; . . . In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." (*Id.* at p. 245.) "There is probable cause if a ' "succession of superficially innocent events ha[s] proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." ' [Citations.]" (*People v. Andrino* (1989) 210 Cal.App.3d 1395, 1402.)

"The test of probable cause 'should not be understood as placing the ordinary man of ordinary care and prudence and the officer experienced in the detection of narcotics offenders in the same class. Circumstances and conduct which would not excite the suspicion of the man on the street might be highly significant to an officer who had had extensive training and experience in the devious and cunning devices used by narcotics offenders to conceal their crimes.' [Citation.]" (*People v. Johnson* (1971) 21 Cal.App.3d 235, 244.)

"[L]aw enforcement officers may draw upon their expertise to interpret the facts in a search warrant application, and such expertise may be considered by the magistrate as a factor supporting probable cause." (*People v. Nicholls* (2008) 159 Cal.App.4th 703, 711.) "A magistrate may reasonably rely on the special experience and expertise of the affiant officer in considering whether probable cause exists." (*People v. Varghese* (2008) 162 Cal.App.4th 1084, 1103 (*Varghese*).) Moreover, "the opinions of an experienced officer may legitimately be considered by the magistrate in making the probable cause determination." (*People v. Stanley* (1999) 72 Cal.App.4th 1547, 1555 (*Stanley*).)

(2) *Appellate Review.*

" 'In reviewing a search conducted pursuant to a warrant, an appellate court inquires "whether the *magistrate* had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." [Citations.]' " (*People v. Scott* (2011) 52 Cal.4th 452, 483, italics added.) "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause

8

existed." (*Gates, supra,* 462 U.S. at pp. 238-239.) "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' [Citation.] . . . '[C]ourts should not invalidate [warrants] by interpreting [affidavits] in a hypertechnical, rather than a commonsense, manner.' [Citation.]" (*Gates*, *supra,* 462 U.S. at p. 236.)

"In reviewing the issuance of a search warrant '[a]ll we are . . . asked to decide is whether the [magistrate] acted properly, not whether [the police officer] did.' [Citations.]" (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1783-1784 (*Tuadles*).) "Because they are often written by nonlawyers in the midst of an investigation, technical requirements for elaborate specificity have no place in the review of search warrant affidavits. [Citations.]" (*Varghese, supra,* 162 Cal.App.4th at p. 1103.) Moreover, "[w]hile, in a particular case it may be difficult to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants." (*Id.* at p. 1104.) "[D]oubtful or marginal cases should be resolved in favor of upholding the warrant." (*Tuadles*, at p. 1784.)

Further, " ' "[[e]xperienced] police officers naturally develop an ability to perceive the unusual and suspicious which is of enormous value in the difficult tasks of protecting the security and safety of law-abiding citizens. The benefit thereof should not be lost because the cold record before a reviewing court does not contain all the particularized perceptions which may have been so meaningful at the scene." [Citation.]' [Citation.]" (*People v. Rich* (1977) 72 Cal.App.3d 115, 121.) "Although individual facts within the affidavit might also be consistent with lawful activities, it is the totality of the circumstances that must be considered. The fact that there may be more than one reasonable inference to be drawn does not defeat the issuing magistrate's finding of probable cause." (*Stanley, supra,* 72 Cal.App.4th at p. 1555.)

Finally, "[t]he standard of review on a motion to suppress is well established. We defer to the trial court's express or implied factual findings if supported by substantial evidence. We, however, apply constitutional principles to the trial court's findings or,

when the facts are undisputed, to independently determine the legality of the search. [Citations.]" (*Varghese, supra,* 162 Cal.App.4th at p. 1096.)

       b. *Application of the Law to This Case.*

In the present case, Miles, a 20-year veteran officer, had received extensive training in the subjects of dangerous drugs, including training in the subjects of the manufacture of concentrated cannabis and counter surveillance techniques. He had received training in the subject of marijuana cultivation. He was assigned to a clandestine laboratory squad that was part of a unit investigating illicit manufacturing of dangerous drugs, locating clandestine drug laboratories, and apprehending persons involved. He had authored, and jointly executed, numerous narcotics-related warrants, and previously had testified as a controlled substance expert. There is no dispute Miles was an expert in controlled substances, dangerous drugs, and the manufacture of concentrated cannabis.

This case involves an affidavit based, not on information from an informant, but on the observations, expertise, and expert opinion of a police narcotics expert. In particular, about 9:00 a.m. on May 28, 2014, Miles was in the area of Third and Wall, "conducting surveillance of a location that is believed to sell large amounts of the chemical Butane." Although Johnny argues "it is not at all clear that the JT [*sic*] Imports location was the initially surveilled location that was believed to sell large quantities of butane," Miles stated (1) he was conducting surveillance of a location believed to sell large amounts of butane, (2) JK Imports was at 328 East Third, and (3) Miles was observing JK Imports when he saw a male exit that business with boxes Miles believed contained a large amount of butane. Miles did not identify any location for his surveillance other than JK Imports. The affidavit reasonably communicated to the magistrate that 328 East Third was in or near the area of Third and Wall and that JK Imports was the location that was the object of Miles's surveillance.[3]

---

[3]    In her opening brief, Sylvia concedes the business which was the object of Miles's surveillance and the business the Hispanic male left were the same business.

According to Miles, butane was a highly flammable chemical, large amounts of which were used to extract THC, the principal psychoactive constituent of marijuana. Such butane was highly purified and was labeled "5X or 7X," meaning the butane had fewer impurities that could be introduced into finished butane honey oil, i.e., hashish. By the size, shape, and labeling of the four boxes, Miles, based on his training and experience, recognized them as four master cases containing a total of about 30 gallons of highly purified butane.

Although Johnny is correct that "Miles did not say that the boxes had any butane labeling," the magistrate reasonably could have inferred from (1) Miles's statement that highly purified butane is "labeled" "5X" or "7X" and (2) his statement that, based on the size, shape, and "labeling" of the four boxes, he recognized them as containing highly purified butane, that Miles saw boxes labeled "5X" or "7X," indicating highly purified butane was inside. Indeed, Johnny conceded during the suppression hearing that Miles "*says* by the look of the box, what's outside the boxes, *the markings on the boxes*, whatever – it's butane." (Italics added.) Similarly, the trial court stated, "The crate says 'butane.' " This implied factual finding by the trial court was supported by reasonable inferences from substantial evidence in the affidavit, therefore, we must defer to that finding when determining whether labeling on the boxes indicated they contained butane.

The affidavit contained additional evidence supporting the magistrate's finding of probable cause. A male put the four boxes in the Explorer. About five minutes later, a woman drove away in the Explorer, ultimately to Granada Hills. En route, the woman stopped at a gas pump, a fact permitting the reasonable inference she might get gas, but, unusually, she never exited the Explorer. Instead, she continued looking in her rearview mirror, a fact permitting the reasonable inference she was looking to see if police were following her. She drove slowly down several side streets, making what appeared to be unnecessary directional changes. Such changes would have made it difficult for police to follow her unobserved. She drove down an alley and stopped but, unusually, did not exit the Explorer. Again, this conduct made it difficult for police to follow her unobserved.

11

Miles observed the woman drive slowly on Kingsbury and turn into the driveway of 17617 Kingsbury. When he reached the Explorer, no one was inside it. It was only when, about 50 minutes later, the woman drove the Explorer to 17619 Kingsbury that someone exited that residence, took the boxes out of the Explorer, and brought them inside that residence. The magistrate reasonably could have concluded the woman drove the Explorer to 17617 Kingsbury as a diversion to dissociate the Explorer from the ultimate 17619 Kingsbury address and to see if police were conducting surveillance of the Explorer, the 17617 Kingsbury address, and her.

Indeed, the trial court noted that if it had been the magistrate, the trial court would have been struck by Sylvia's driving which, based on Miles's training and experience, "comport[ed] with his estimation of why this butane was sought." This was tantamount to an implied factual finding, to which we must defer, that Sylvia engaged in counter surveillance driving (evidence of consciousness of guilt; see *People v. Tripp* (2007) 151 Cal.App.4th 951, 956), comporting with Miles's expert opinion the butane was sought for unlawful purposes associated with manufacturing butane honey oil. The fact another inference might have been drawn from the above facts does not defeat a finding of probable cause to search.

Miles opined based on his training and experience in investigating and processing clandestine butane honey oil manufacturing laboratories that the residence at 17619 Kingsbury was an active butane honey oil laboratory and manufacturing activity would be found in the location. He based this on the above mentioned "counter surveillance driving tactics," the parking of the Explorer at 17617 Kingsbury for almost an hour, and the very large amount of butane brought into 17619 Kingsbury. Moreover, Miles stated, "There is no legitimate use for large amounts of butane," observing there were about 30 gallons of butane in this case.

12

We assume there was nothing facially illegal about the placement of 30 gallons of butane in the Explorer at Third and Wall and/or the transportation of the butane to 17619 Kingsbury. However, Miles's statements in the warrant and affidavit pertained to (1) his personal observations and expert opinions about the four boxes and their contents as containing butane, (2) the woman's driving which Miles characterized as counter surveillance driving, (3) the large amount of butane involved, i.e., about 30 gallons, (4) butane being either an associated chemical needed to make butane honey oil (hashish) or a precursor chemical, and (5) his opinion, as an expert in controlled substances, dangerous drugs, and the manufacture of concentrated cannabis, that there was "no legitimate use for large amounts of butane." Miles also indicated a male exited 17619 Kingsbury and took into that residence the boxes that had been in the Explorer, and, in Miles's expert opinion, an unlawful butane honey oil laboratory was inside the residence at 17619 Kingsbury, and unlawful manufacturing of butane honey oil was occurring there.

As indicated, the magistrate was entitled to rely on the special experience, expertise, and opinions of Miles, an experienced officer and expert. We pay great deference to a magistrate's probable cause determination. We do not invalidate warrants by interpreting them in a hypertechnical, rather than common sense, manner, and we resolve any doubtful or marginal cases in favor of upholding the warrant. On the basis of Miles's statements in the affidavit, we conclude the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing at the locations specified in the warrant.

None of the cases cited by Johnny and Sylvia, or their arguments, compels a contrary conclusion. While a more fact-intensive affidavit may have been helpful, the level of detail was adequate. "Because they are often written by nonlawyers in the midst of an investigation, technical requirements for elaborate specificity have no place in the review of search warrant affidavits. [Citations.]" (*Varghese, supra,* 162 Cal.App.4th at p. 1103.) Moreover, probable cause to search is a fluid concept that takes its substantive content from the particular context in which the standard is being assessed (*Ornelas v.*

13

*United States* (1996) 517 U.S. 690, 696 [134 L.Ed.2d 911, 919]) and " 'each case is to be decided on its own facts and circumstances.' " (*Ibid*.)[4]

2. *Even if the Warrant Lacked Probable Cause to Search, the Good-Faith Exception to the Exclusionary Rule of the Warrant Requirement Applied.*

Johnny and Sylvia claim the good faith exception of *United States v. Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677] (*Leon*), does not apply. We conclude that even if the warrant was not supported by probable cause to search, the good faith exception to the exclusionary rule applied. In *Leon*, "the high court held that where police officers act in objectively reasonable reliance on a search warrant that is issued by a detached and neutral magistrate but is later found to be invalid for lack of probable cause, the deterrent effect of exclusion is insufficient to warrant the exclusionary rule's application." (*People v. Willis* (2002) 28 Cal.4th 22, 30.)

In the present case, the search warrant was supported by much more than a "bare bones" affidavit, and the information provided was sufficient to make the probable cause determination, at worst, a close question for any objectively reasonable and well-trained officer. Therefore, reliance on the warrant was objectively reasonable and suppression of the evidence was not required. (Cf. *Camarella, supra,* 54 Cal.3d at pp. 602-606.)

---

[4]     In her opening brief, Sylvia concedes a possible "logical conclusion from the facts presented is that these unnamed and unknown individuals were potentially involved in the manufacture or sales of 'Butane Honey Oil.' " As mentioned, a male exited the residence at 17619 Kingsbury and took into the residence the boxes that were in the Explorer driven by the unnamed and unknown woman. Moreover, in her opening brief, Sylvia concedes "[Sylvia's] use of the 'counter surveillance driving tactics' " was "suspicious." In her reply brief, she concedes the fact of her "unloading of large amounts of butane at the Kingsbury residence" and concedes "the delivery of butane to the Kingsbury residence" was "highly suspicious." We accept the above concessions. Moreover, although Sylvia asserts "there is no logical reason why the residents of the Kingsbury home could not have been in the lighter business," the assertion suggests it was reasonable to infer the occupants were conducting a business. Alternative inferences do not defeat a magistrate's finding of probable cause to search.

14

The fact "a reasonable officer might have undertaken additional investigation to augment the affidavit before submitting it to the magistrate" (*Camarella*, *supra,* 54 Cal.3d at p. 606) does not compel a contrary conclusion.  "The question under *Leon*, . . . is not whether further investigation would have been reasonable, but whether a reasonable officer in [the officer's] position would have *known* that the affidavit, as it existed at the time it was to be presented to the magistrate, was legally insufficient without additional and more recent corroboration."  (*Ibid.*)

### ISSUE (as to Galindo)

After examination of the record, appointed appellate counsel for Galindo filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.  By notice filed February 1, 2016, the clerk of this court advised Galindo to submit within 30 days any contentions, grounds of appeal, or arguments he wished this court to consider.  No response has been received to date.

### REVIEW ON APPEAL (as to Galindo)

We have examined the entire record and are satisfied counsel for Galindo has complied fully with counsel's responsibilities.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

*DISPOSITION (as to all appellants)*

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

HOGUE, J.[*]

We concur:

EDMON, P. J.

ALDRICH, J.

---

[*]  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16